Filed 4/21/26  P. v. Boushnak CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RONIN BOUSHNAK,<br><br>    Defendant and Appellant. | B329468<br><br>(Los Angeles County Super. Ct. No. BA467749) |

APPEAL from a judgment of the Superior Court of Los Angeles County, James R. Dabney, Judge.  Affirmed with directions.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Wyatt E. Bloomfield, Supervising

Deputy Attorney General, and Charles Chung, Deputy Attorney General, for Plaintiff and Respondent.

_____

Ronin Boushnak appeals from the judgment of conviction entered after a jury found him guilty of the attempted murder of his girlfriend's brother-in-law, solicitation of murder, and criminal threats. Boushnak contends the trial court engaged in misconduct during the trial by repeatedly interrupting and disparaging defense counsel, failing to control the courtroom, and displaying bias against the defense. Boushnak also argues the prosecutor engaged in misconduct by disparaging defense counsel throughout the trial. In addition, Boushnak requests we review the sealed record of the in camera hearing on his *Pitchess*[1] motion to determine whether the court ordered all relevant complaints to be disclosed.

We affirm the judgment but direct the trial court to correct an error in the abstract of judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

A. *The Evidence at Trial*

Boushnak began dating Sarah Mudrak in 2011 or 2012, and in 2016 their daughter Nora was born. The couple decided to get married in Egypt, where Boushnak's mother and sister lived. In late 2017 Mudrak traveled to Egypt for the wedding, bringing 18-month-old Nora with her. Mudrak's sister, Samareh, and her sister's husband, Derek Aghchay, also went to Egypt for the

---

[1]    *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

wedding. Boushnak planned to meet the family in Egypt two weeks later. However, before Boushnak left Los Angeles, Mudrak told him she did not want to get married. She encouraged Boushnak to come to Egypt anyway because they had already planned the trip and Mudrak's family would be in Egypt. Boushnak agreed and traveled to Egypt to spend time with his family.

When Boushnak arrived in Egypt, he and Mudrak got into multiple arguments. In response, Boushnak took Mudrak's and Nora's passports and the money Mudrak had with her in Egypt. A few days later, Boushnak, Mudrak, and Mudrak's family went to a restaurant, where Boushnak got into an argument with the family members. Boushnak then took Nora from Mudrak's arms and ran out of the restaurant. He took Nora to his mother's home and planned to obtain Egyptian citizenship for Nora so she could stay in Egypt.

Mudrak and Aghchay filed a report with the police stating that Boushnak had taken Nora. A police officer drove them to Boushnak's mother's apartment to pick up Nora, but there was no one home. Aghchay helped Mudrak hire a lawyer, and they obtained an emergency passport for Nora because Boushnak still held her passport. Approximately a week after Boushnak took Nora, Mudrak regained custody of Nora, and they returned to Los Angeles.

Upon returning to Los Angeles, Mudrak moved out of the apartment she had shared with Boushnak, and she and Nora moved in with Aghchay and his family. Aghchay hired an attorney to assist Mudrak in obtaining custody of Nora. He also accompanied Mudrak to hearings in the family law custody case that took place in early 2018. Aghchay often saw Boushnak in

3

the courthouse on the hearing dates, and Boushnak would threaten Aghchay, saying "I'm going to take care of you" or "I'm going to fuck you up."

Boushnak was angry at Aghchay and blamed him for enabling Mudrak to leave Egypt with Nora. Boushnak's close friend Jeffrey Anderson testified that in early 2018 Boushnak talked about Aghchay daily. According to Anderson, "[Boushnak] wanted to torture [Aghchay]. He wanted someone else to torture, kidnap him, bring him to him, and he would kill him, take him out. Head of a snake. Constant, constant conversations." Boushnak asked Anderson if Anderson's cousin, who had gang affiliations, could kill Aghchay.

Anderson initially thought Boushnak was just venting, and Anderson did not take him seriously. However, in February 2018 Anderson began to take the threats seriously when Boushnak started following Aghchay, going to his house, and looking through the windows. In April 2018 Boushnak told Anderson he had found someone to kill Aghchay. On April 9 Anderson met Boushnak at a restaurant, and Boushnak introduced Anderson to "Osama," who Boushnak said was the man he had hired to kill Aghchay. When the three men left the restaurant, Boushnak told Anderson that he was going to show Osama where Aghchay lived.

Later on April 9, Boushnak called Anderson and said he had "a cool story" to tell him. Something about the way Boushnak said this caused Anderson to be concerned that "maybe something happened." Anderson decided to record the conversation. In the recording, which was played for the jury, Boushnak recounted that he had driven with Osama to Aghchay's house. While they were outside the house, Aghchay exited, and Boushnak and Osama followed him to a nearby store. Boushnak

4

confronted Aghchay outside the store and threatened him, saying, "You want it now or do you want it tonight?" Aghchay testified that Boushnak was screaming and jumping, and Osama had to hold Boushnak back by his belt. Aghchay thought Boushnak was going to attack him.

Between April 9 and May 1, 2018 Anderson secretly recorded eight conversations he had with Boushnak. The recordings were played for the jury at trial. During one of these conversations, Boushnak said he was "obsessed" with Aghchay and added, "I need a couple of boys in the hood, bro, to take that boy out." During another conversation, Boushnak discussed the "pros and cons" of whether to "get rid of" Aghchay before or after an upcoming family court hearing. He also wondered whether a hitman would "pop him right in front of his house" or "shank him."

After Boushnak recounted his confrontation with Aghchay, Anderson believed Boushnak was going to harm Aghchay. Anderson contacted Aghchay and told him about his recent conversations with Boushnak. Anderson and Aghchay filed a police report, and Anderson gave a copy of the April 9 recording to the police officers. As part of the investigation that ensued, a police detective gave Anderson contact information for an undercover police officer who could pose as a hitman.

Boushnak decided not to hire Osama as a hitman, and Anderson gave Boushnak the phone number for the undercover police officer, whom Anderson offered as another potential hitman. Anderson told Boushnak the undercover officer was a friend of Anderson's cousin.

On April 24, 2018 Boushnak met the undercover officer, Los Angeles Police Detective Carl Worrell, at a restaurant. Worrell recorded the conversation, which was also played for the jury. Boushnak gave Worrell a photograph of Aghchay and showed him photographs of Aghchay's house. Boushnak told Worrell he would "prefer for [Aghchay] to just disappear." Worrell said it would cost $5,000 or $6,000 to "make this right."

Boushnak and Worrell met again at a coffee shop on May 1, 2018. The recording of their conversation was played for the jury. Worrell told Boushnak that Aghchay "could be touched" and Worrell and the "people helping [him] out" "can make this happen." Worrell continued, "[L]isten, you give me the money; you want him dead he's gone." Boushnak responded, "You're going to get the money." Boushnak told Worrell he would leave the money in the bathroom of the coffee shop. When Worrell left the table, he found an envelope with cash in the bathroom where Boushnak had indicated it would be.

B.    *The Verdict and Sentencing*

The jury found Boushnak guilty of attempted willful, deliberate, and premeditated murder (Pen. Code, §§ 187, subd. (a), 664; count 1), solicitation of murder (§ 653f, subd. (b); count 2), and making criminal threats (§ 422, subd. (a); count 3). The trial court sentenced Boushnak on count 3 to the middle term of two years in state prison for making criminal threats, plus a consecutive term on count 1 of life for attempted willful, deliberate, and premeditated murder. The court imposed and stayed pursuant to section 654 the middle term of six years for solicitation of murder.

Boushnak timely appealed.

# DISCUSSION

A. *There Was No Judicial Misconduct*

1. *Governing law and standard of review*

As the Supreme Court explained in *People v. Nieves* (2021) 11 Cal.5th 404, 477 (*Nieves*), "'[t]rial judges "should be exceedingly discreet in what they say and do in the presence of a jury'" [citation] and their comments "'must be accurate, temperate, nonargumentative, and scrupulously fair'" [citation]. "'Although the trial court has both the duty and the discretion to control the conduct of the trial [citation], the court 'commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution' [citation]. Nevertheless, '[i]t is well within [a trial court's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior.'"'"

"We review claims of judicial misconduct on the basis of the entire record." (*People v. Peoples* (2016) 62 Cal.4th 718, 789.) "[T]he propriety and prejudicial effect of a particular comment are judged by both its content and the circumstances surrounding it." (*People v. Abel* (2012) 53 Cal.4th 891, 914.) "'[O]ur role . . . is not to determine whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so prejudicial that it denied [the defendant] a fair, as opposed to a perfect, trial.'" (*People v. Snow* (2003) 30 Cal.4th 43, 78.)

2. *Boushnak did not forfeit his misconduct claim*

"As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial. [Citations.] However, a defendant's failure to object does not preclude review 'when an objection and an admonition could not cure the prejudice caused by' such misconduct, or when objecting would be futile." (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237.) Where there is "hostility between the trial judge and defense counsel . . ., it would also be unfair to require defense counsel to choose between repeatedly provoking the trial judge . . . and therefore poisoning the jury against his client or, alternatively, giving up his client's ability to argue misconduct on appeal." (*Ibid.*)

Defense counsel failed to object to any of the trial court's statements he now claims constituted judicial misconduct. Although the interactions between the trial court and defense counsel were not quite hostile, it is clear from the transcript that their interactions were at times acrimonious and created tension in the courtroom. Under these circumstances, especially given the number of remarks at issue, it would be unfair to require defense counsel to have repeatedly objected in order to preserve a claim for judicial misconduct. (See *Nieves*, *supra,* 11 Cal.5th at p. 482, fn. 12 [declining to find forfeiture due to "the discord between the trial judge and defense counsel [and] the number of admonitions and remarks at issue"].) We therefore decline to find forfeiture.

### 3. *The trial court's statements to defense counsel and its control of the courtroom did not constitute misconduct*

Boushnak cites more than two dozen statements made by the trial court over the course of the nine-day trial as instances of inappropriate conduct that, individually or collectively, constituted misconduct. He also argues the court's failure to control the courtroom constituted misconduct. We review Boushnak's contentions against the backdrop of how defense counsel and the prosecutor conducted themselves during the trial. The attorneys displayed animosity toward each other, interrupted each other, made speaking objections despite the court's direction not to do so, and on multiple occasions addressed sarcastic remarks to one another. Defense counsel repeatedly interrupted the trial court, the prosecutor, and the witnesses. She also frequently argued with the court after it ruled on objections. Although the court's efforts to control the trial were at times not ideal (and often not successful), there was no misconduct.

Boushnak argues the trial court "repeatedly interrupted and disparaged defense counsel, telegraphing to the jury [its] negative personal views of defense counsel." (Boldface and capitalization omitted.) Several of the examples Boushnak cites are instances where the court admonished defense counsel to discontinue irrelevant, repetitive, or improper questioning. For example, during defense counsel's cross-examination of Anderson, defense counsel repeatedly read portions of the transcript of recorded conversations between Boushnak and Anderson and asked Anderson to comment on whether he agreed with defense counsel's interpretation of what Boushnak had said (for example, whether certain statements meant that Boushnak wanted to kill

9

Aghchay or that he was just "dreaming" about killing him).  In one instance defense counsel asked Anderson to review the transcript of an April 11 conversation and asked, "Can you show me . . . where [in the transcript] you saw [Boushnak] asking you to get your cousin to kill."  Anderson started to respond, "It's a long conversation," and the prosecutor objected.  The court inquired of defense counsel, "What is your question?" and defense counsel responded, "We're going through the conversation."  The prosecutor again objected (that defense counsel was not asking a question), and the court again requested defense counsel identify the question.

At sidebar, defense counsel explained she wanted to ask Anderson whether when Boushnak said he was hiring his cousin to kill Aghchay, Boushnak was really "talking about" the fact he was "'dreaming about it.'"  At this point the trial court cautioned defense counsel against simply reading portions of the transcript as her questions, stating, "It doesn't impeach him.  It's already in the evidence.  What's the relevance of—[interruption by defense counsel].  The conversation is the conversation.  It's already in evidence.  What is—[interruption by defense counsel].  What do you want him to do with it?"  Defense counsel responded that she was trying to make the point that when Boushnak described his dream of hiring a hitman, Anderson "starts nudging [Boushnak] towards getting a hitman" instead of saying "'forget about it.'"  The court stated, "What he says and what he doesn't say is in the recording.  What are you asking him to do with this information? . . .  You are basically repeating stuff that's already in there, which you can use.  It's in evidence.  You can argue this to your heart's content.  I'm not sure what the hell you're asking him to do."

10

When cross-examination resumed, defense counsel again asked Anderson to characterize statements from the recordings. After the prosecutor objected, the trial court stated, "The conversation is in evidence, so I don't know what your question is. Are you asking this witness for his take on the conversation? And if so, why is that relevant?" Defense counsel continued to ask about the recording, and the prosecutor objected again, prompting the court to state, "Again, I don't know what the relevance is of his—the conversation is what it is. Okay? So you may use it to your heart's content, but argument—ask him a question that's relevant in some fashion. And his take on this, unless there's ambiguity, it's not relevant."

At other points the trial court admonished defense counsel by stating, "Stop arguing. Ask questions. Stop arguing. There's a time for that. Don't argue with the witness"; "Let's not go around in circles"; "I don't know why we're going around and around on this"; and "Let him finish. If you don't want to hear the answer, I suggest you simply don't ask it."

In addition to the trial court's comments, Boushnak argues the court committed misconduct in failing to control the court reporter from acting "exasperatedly in front of the jury." The court reporter frequently reminded the attorneys not to speak over one another. These reminders escalated to increasingly frustrated comments by the court reporter such as, "Stop, please. Please stop interrupting the judge," "I can only go so fast," "I'm done. Stop it," "Oh my god. I'm so done," and "Are you kidding me?" During one exchange outside the presence of the jury, when defense counsel repeatedly interrupted the court, the court reporter said, "Okay. Hold on. Can you please let the judge finish?" Defense counsel responded, "Can you just sit there and

type?" The court told counsel not to "get into it with the court reporter," and counsel complained, "She's being rude." The court responded, "You're being rude. You talk very fast, you interrupt—and you interrupt when anyone is speaking, and you're rude. I'm not getting into this now."

Boushnak also contends the trial court allowed the prosecutor to "blurt[] out comments" and "[make] deprecating remarks" about defense counsel. The examples Boushnak cites are essentially instances in which the prosecutor made speaking objections to defense counsel's questions. For example, the prosecutor at one point stated, "I'm sorry. How is that impeachment?" and later, "Do I get to object for calling for speculation at this point?" Boushnak argues allowing these comments inappropriately permitted the prosecutor to "telegraph[] both her frustration with [defense counsel] and her not-so-veiled opinion that [defense counsel] was doing less than a stellar job."

Boushnak's argument that the trial court's comments and control of the courtroom constituted misconduct is unavailing. As discussed, the trial court has a duty to control the courtroom, and "'isolated comments in a lengthy trial in which the court exhibited some impatience with counsel's argumentative comments and questions do not demonstrate misconduct or bias.'" (*Nieves, supra*, 11 Cal.5th at pp. 482-483; see *People v. Blacksher* (2011) 52 Cal.4th 769, 825 ["frustration and irritation" between "'court and counsel, while not desirable, are virtually inevitable in a long trial'"].) The Supreme Court has repeatedly found impatient and abrupt statements by the trial court do not rise to the level of misconduct. (See *Nieves,* at p. 483 ["We do not fault the trial judge here for the brief admonitions he gave to enforce

12

court rules and procedures."]; *People v. Woodruff* (2018) 5 Cal.5th 697, 771-772 [no judicial misconduct where court made statements to defense counsel such as, "'Come on.  If you're going to continue along with this, I'm going to cut you off right now. Let's move on to something probative'" and "'[Y]ou're testifying. Unless you want to raise your right hand and take the oath, don't do it again.'"]; *People v. Harris* (2005) 37 Cal.4th 310, 348 [no judicial misconduct where court repeatedly challenged relevancy of defense counsel's questions, stated questions were "a 'waste of time,'" and "'meaningless'" and told counsel to "'move on'"]; *People v. Snow, supra,* 30 Cal.4th at pp. 79, 81 [no judicial misconduct where court told counsel not to argue with the witness, to "'get right to the issue,'" and when instructing counsel to "'speed up,'" stated, "'Counsel, I told you how much this court costs to operate'"].)

On the other hand, a trial court's statements "that impugned counsel's competence" or "'impl[ied] to the jury that defense counsel was deliberately asking improper questions'" may constitute judicial misconduct.  (*Nieves*, *supra,* 11 Cal.5th at p. 483; accord, *People v. Sturm, supra,* 37 Cal.4th at p. 1240 ["'It is completely improper for a judge to advise the jury of negative personal views concerning the competency, honesty, or ethics of the attorneys in a trial.'"].)  Such statements may include "highlight[ing] the repeated warnings and admonitions counsel had violated," referring to counsel's statements as "'false and misleading,'" and sanctioning and citing counsel for misconduct and contempt in front of the jury.  (*Nieves,* at p. 484; see also *Sturm*, at pp. 1235, 1240-1241 [court committed judicial misconduct where it told defense counsel, "[C]learly you know these questions are objectionable," accused counsel of trying to

13

"'sneak'" improper questions by the court, and told the jury "'we have spent an inordinate amount of time whereby objections are raised with regard to questions by [defense counsel]'"].)

The trial court's statements to defense counsel fall well within the former category. None of the court's comments impugned defense counsel's competence or implied that she was dishonest or purposefully engaging in misconduct. Nor did the court engage in personal attacks on defense counsel. Likewise, nothing about the court's management of the courtroom, including its reaction to statements by the court reporter or prosecutor, suggested a bias against defense counsel. Although the court expressed impatience and frustration with defense counsel's frequent interruptions and argumentative questions, the court's conduct did not exceed the bounds of appropriate judicial behavior intended to maintain control of an acrimonious courtroom.

4.    *Boushnak has not demonstrated misconduct based on the trial court's evidentiary rulings*

Boushnak argues the trial court exhibited bias in several of its evidentiary rulings. For example, Boushnak argues the court "interfered with Boushnak's right to present a complete defense" by excluding a portion of a recording of a conversation between Boushnak and Anderson. The prosecution introduced 10 minutes of an approximately 70-minute recording from May 1, 2018 in which Boushnak discussed hiring a hitman. Defense counsel sought to introduce another portion of the recording in which Boushnak discussed with Anderson serving Aghchay with a restraining order and an upcoming court appearance at which Anderson would testify. Defense counsel argued that this portion

of the tape would show an inconsistency between Anderson's desire to set up Boushnak for his alleged plan to kill Aghchay and Anderson's willingness to testify at a family court hearing. The court denied Boushnak's request to admit the portion of the recording, explaining that Boushnak's statements on the recording could not be admitted as prior inconsistent statements with respect to earlier testimony by Anderson (because the statements were made by Boushnak, not Anderson), and they did not fall within another applicable hearsay exception.

Boushnak contends the trial court's failure to admit the remaining portions of the recording violated Evidence Code section 356 and was misconduct because it "created a misleading impression that served only to bolster the prosecution's theory of the case."[2] However, defense counsel did not cite section 356 at trial as a basis for admissibility of the recording, and to the extent Boushnak seeks to appeal the court's ruling on the merits, the claim is forfeited. (*People v. Marks* (2003) 31 Cal.4th 197, 228 ["A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal."])

---

[2] Evidence Code section 356 provides that where a portion of a conversation is admitted into evidence, another portion of the same conversation may be admitted where "necessary to make [the admitted portion] understood."

Boushnak has failed to explain how this ruling, or any of the other evidentiary rulings he now challenges, showed bias against defense counsel. Adverse rulings—""even when erroneous—do not establish a charge of judicial bias, especially when they are subject to review."" (*People v. Buenrostro* (2018) 6 Cal.5th 367, 405.)

B. *Boushnak's Claims of Prosecutorial Misconduct Lack Merit*
　　1. *Governing law and standard of review*

""A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact."" (*People v. Parker* (2022) 13 Cal.5th 1, 72; accord, *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 657.)

When a defendant's claim of misconduct focuses upon prosecutorial comments before the jury, the issue is whether a reasonable likelihood exists that the jury construed or applied any of the complained-of remarks in an objectionable fashion. (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1403.) "A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel." (*People v. Hill* (1998) 17 Cal.4th 800, 832.) "However, 'the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account.'" (*People v. Winbush* (2017) 2 Cal.5th 402, 484 (*Winbush*).)

"We review claims of prosecutorial misconduct under an abuse of discretion standard [citations], asking whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion." (*People v. Dworak* (2021) 11 Cal.5th 881,

16

910; accord, *People v. Steskal* (2021) 11 Cal.5th 332, 350.) "'[W]e "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'"" (*People v. Spector, supra,* 194 Cal.App.4th at p. 1403.)

2. *The prosecutor's alleged disparagement of defense counsel did not constitute misconduct*

As an initial matter, Boushnak forfeited his claim of prosecutorial misconduct by failing to object in the trial court. "To preserve a claim of misconduct for appeal, a defendant must make a timely objection and ask the court to admonish the jury, unless an objection would have been futile and a request for admonition ineffective." (*People v. Flores* (2020) 9 Cal.5th 371, 403.) However, because Boushnak argues ineffective assistance of counsel, we consider the asserted instances of prosecutorial misconduct to determine whether Boushnak's counsel should have raised an objection to the prosecutor's statements (assuming no tactical reason for not objecting).[3]

Boushnak argues the prosecutor repeatedly interrupted, scolded, and belittled defense counsel, painting her "as an incompetent attorney who was not able to ask coherent

---

[3]     To prevail on a claim of ineffective assistance of counsel, "defendant must show, among other things, that his 'counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.' [Citation.]  In evaluating his claim, we 'defer[ ] to counsel's reasonable tactical decisions' and presume that 'counsel acted within the wide range of reasonable professional assistance.'" (*People v. Arredondo* (2019) 8 Cal.5th 694, 711; accord, *People v. Salcido* (2008) 44 Cal.4th 93, 172.)]

17

questions." Boushnak provides several examples, which reasonably could be characterized as a frustrated prosecutor making speaking objections with a sarcastic tone. For example, at various points in the trial, the prosecutor interrupted defense counsel's examination of witnesses by stating, "I'm sorry. How is that impeachment," "Well, that's not a question," and "Is this— are we just going to read from the transcript?" In one exchange during the prosecutor's direct examination of Aghchay, defense counsel objected that the witness's testimony called for speculation. The prosecutor responded, "If he could be allowed to say things, that would be great." Later during defense counsel's direct examination of Boushnak, the prosecutor objected and stated, "At some point, maybe there should be a question that's not completely leading."

While the prosecutor's speaking objections were at times inappropriate, they did not rise to the level of deceptive or reprehensible methods. "Objections constitute misconduct only if they go beyond the charge of legal or procedural violation and directly or by clear inference question the motives or integrity of opposing counsel." (*People v. Price* (1991) 1 Cal.4th 324, 448.) The prosecutor's objections, even if indelicately stated, were directed toward the impropriety of the questions and not the motives or integrity of defense counsel. (See *People v. Peoples, supra*, 62 Cal.4th at p. 793 [prosecutor's characterization of defense counsel's arguments as "'ludicrous,'" "'ridiculous,'" and "'outrageous'" did not establish misconduct]; *People v. Mendoza* (2007) 42 Cal.4th 686, 701 [prosecutor's "needlessly sarcastic" remark was not misconduct].) There was no reasonable likelihood that the jury construed the prosecutor's remarks in an objectionable fashion.

C.    *The Trial Court Complied with Its Obligations Under* Pitchess

On September 22, 2022 Boushnak filed a *Pitchess* motion pursuant to Evidence Code section 1043, seeking discovery with respect to a Los Angeles Police Department officer concerning "[a]ll complaints from any and all sources relating to acts of: fabrication of evidence, fabrication of reasonable suspicion and/or probable cause, illegal search and seizure; false arrest; perjury; dishonesty; writing of false police reports; false or misleading internal reports including but not limited to false overtime or medical reports; and any other evidence of misconduct amounting to moral turpitude." The trial court granted the motion, conducted an in camera hearing, and found no disclosure was required.

"'When a defendant shows good cause for the discovery of information in an officer's personnel records, the trial court must examine the records in camera to determine if any information should be disclosed.'" (*People v. Rivera* (2019) 7 Cal.5th 306, 338; accord, *People v. Anderson* (2018) 5 Cal.5th 372, 391 (*Anderson*).) "'The court may not disclose complaints over five years old, conclusions drawn during an investigation, or facts so remote or irrelevant that their disclosure would be of little benefit.'" (*Rivera*, at p. 338; accord, *Winbush, supra,* 2 Cal.5th 402 at p. 424; see Evid. Code, § 1045, subd. (b).) "'*Pitchess* rulings are reviewed for an abuse of discretion.'" (*Rivera*, at p. 338; accord, *Anderson*, at p. 391.)

19

Boushnak requests we review the sealed portion of the record, which includes the transcript of the in camera hearing. The People do not object to our review. Boushnak's request for us to review the sealed records is proper. (*Anderson, supra*, 5 Cal.5th at p. 391 ["Defendant properly asks us to review the sealed record of the in camera hearing to determine whether the court erroneously failed to provide discovery that he should have received."]; see *People v. Rivera, supra*, 7 Cal.5th at pp. 338-339.)

We have reviewed the sealed record. The trial court did not abuse its discretion in concluding there was no discoverable information to disclose. (See *Anderson, supra*, 5 Cal.5th at p. 391; *Winbush, supra*, 2 Cal.5th at p. 424.)

D.     *The Abstract of Judgment Requires Correction*

The record contains an abstract of judgment for the indeterminate term, but not an abstract for the determinate terms. Further, there is an error in the abstract of judgment for the indeterminate term that must be corrected. The trial court sentenced Boushnak to life imprisonment for attempted murder. However, the abstract of judgment indicates a sentence of life without the possibility of parole. We direct the trial court to prepare an amended abstract of judgment that reflects the correct indeterminate term imposed and to ensure there is a separate abstract of judgment for the determinate terms.

## DISPOSITION

The judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment that reflects the correct indeterminate term and to ensure there is a correct

abstract of judgment for the determinate term.  The court is further directed to send a corrected abstract of judgment for the indeterminate term and, if applicable, for the determinate terms to the California Department of Corrections and Rehabilitation.


                                                    FEUER, J.

We concur:


        SEGAL, Acting P. J.


        GIZA, J.*

<hr />

*       Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.